IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
October 9, 2012 Session

## STATE OF TENNESSEE v. ANTWAIN GREEN

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3571     J. Randall Wyatt, Jr., Judge**

**No. M2012-00234-CCA-R3-CD - Filed February 20, 2013**

The defendant, Antwain Green, was convicted of two counts of attempted second degree murder of Anthony Fizer and Carrie Searcy, Class B felonies, and three counts of aggravated assaults on, Fizer, Searcy and Laura Dykes, Class C felonies. The aggravated assault convictions of Fizer and Searcy merged with the two attempted second degree murder convictions. The defendant was sentenced as a Range II offender to eighteen- year terms for each attempted murder conviction and a nine- year term for the aggravated assault conviction of Dykes, to be served consecutively to each other for an effective sentence of forty-five years. The defendant appeals his convictions and sentences, asserting that the evidence introduced at trial was insufficient to sustain the convictions, that a witness was improperly permitted to testify regarding one victim's identification of the defendant, and that his sentences are improper and excessive. Having reviewed the record, we conclude that the evidence was sufficient to sustain the convictions, that the error in admitting the testimony regarding identification was harmless, and that the trial court did not abuse its discretion in sentencing. Accordingly, we affirm the judgments of convictions and sentences of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and JEFFREY S. BIVINS, J.J., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Antwain Green.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Ben Ford and Brian Ewald, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural History

On August 17, 2009, Laura Dykes, an assistant public defender, and Carrie Searcy,[1] her intern, were at a housing project interviewing witnesses in an unrelated case when they were caught between Anthony Fizer, a victim in this case, and a man who was shooting at him. Both Ms. Searcy and Mr. Fizer were injured, and Mr. Fizer gave the police information which led to the defendant's arrest. The defendant was charged with two counts of attempted first degree murder and three counts of aggravated assault. At trial, the State presented the following evidence:

Daniel Crockett of the Metropolitan Nashville Police Department testified that on August 17, 2009, he responded to a report that shots had been fired at a housing project. He was directed to a victim who was lying on the floor among family members and who informed Officer Crockett that he had been shot while riding his bicycle. Officer Crockett attempted to locate the scene of the shooting in order to secure the area, but was unable to find anything. Officer Crockett testified that the victim stated he did not know who had shot him. On cross-examination, Officer Crockett confirmed that the victim also could not give a description of the shooter, and he stated that he did not search the area around the victim to determine if the victim might have had a gun.

The State then presented as evidence the 911 calls related to the shooting. The custodian of records with Davidson County's 911 service authenticated a recording of five emergency calls reporting the shooting. One resident at the housing project reported that two men in their twenties were shooting, with about fifteen shots fired. One man was wearing all black, and another had on a white shirt. Children were in strollers at the time, and the caller could not see the person at whom they were shooting. Another resident called to say that three or four people were wearing black and shooting through the projects. One resident reported multiple gunshots and that somebody was shot, that there was a "big crowd" of adults shooting, and that as she had started to walk down to the scene, they had started shooting again. Another caller reported that there was "a bunch of shooting" as children were going to get off the school bus.

The 911 calls included the call from Ms. Dykes seeking medical aid for Ms. Searcy, who had been shot. Ms. Dykes told the emergency responder that one teenage boy had been shooting at another. Ms. Dykes confirmed that one man had on all black clothing, then stated, "Both of them may have, for all I know. I don't know. We heard the gunshots; we got behind the cars and they came running; she got nicked." Ms. Dykes later stated, "We saw

---

[1]Ms. Searcy's name at the time of the incident was Carrie Gleaves, and she is intermittently referred to as Ms. Gleaves in the record.

them both running by us, but you know, I was busy trying to hide. There was a whole pile of people out there. We were talking to a grandmother and her, like, four-year-old little girl when the first set of shots went off."

The State next presented the testimony of Ms. Searcy. Ms. Searcy testified that she and Ms. Dykes were interviewing witnesses for an unrelated case at the housing project where the shooting took place. She testified that they had finished interviewing a witness and had stopped to talk with an elderly resident when they heard four or five gunshots. At that point, they couldn't see anyone, but could hear sounds like firecrackers and a "ting" from something striking a metal object; Ms. Searcy recognized the sounds as gunfire. Ms. Dykes suggested to Ms. Searcy and the elderly resident, who had a small child with her, that they go to Ms. Dykes' nearby car, and Ms. Searcy picked up the child and started towards the car. The resident, however, wanted to return to her home, so Ms. Searcy went back and handed the child to her and then followed Ms. Dykes, who was almost to her vehicle. Ms. Dykes was crouched down behind her car in the street.

When Ms. Searcy was ten or fifteen feet from the car, she felt something hit her arm. She initially thought it might have been a rock but then realized there was extensive bleeding. Around the same time, she saw a person running past her going the opposite direction, heard a "pop," and realized she was between two people chasing each other. Ms. Searcy stood behind the car, and the pursuer moved in front of the car and walked down the center of the street from ten feet in front of the car to approximately the middle of the car, at which point Ms. Dykes grabbed Ms. Searcy and asked her to get down on the other side of the vehicle. Ms. Searcy testified she only saw one person chasing the runner. The person chasing the runner was a light-skinned black male of average height and medium build, and Ms. Searcy saw him holding and firing a gun. Ms. Searcy identified the defendant as the person firing the gun and stated that she only saw one individual fire a gun that day. The gun was fired six or seven times after she got to the car, and the shooter was aiming at the runner. The shooter continued to walk down the street, and Ms. Searcy told Ms. Dykes that she was injured. The blood was spurting out of Ms. Searcy's wound with every heartbeat. When the women realized that the shooter had passed them, they both crawled through the passenger door and drove away. The shooter turned around when the car began to move and continued to stand in the road. Ms. Dykes immediately called 911 and coordinated a meeting place for the ambulance.

Ms. Searcy testified that a detective presented her with a photographic array that night while she was on pain medication, "pretty out of it," and "falling asleep every couple of minutes." Ms. Searcy testified that she told the detective that she could pick out the shooter, but that she did not feel comfortable doing so at the time due to the pain medication and because she hadn't slept.

Ms. Searcy testified that the bullet exited her body, although small fragments remain in her arm. She testified that the bone was shattered and a metal plate with screws was inserted into her arm. She underwent physical therapy to "get some range of motion back."

On cross-examination, Ms. Searcy testified that she found out an arrest had been made later that same week but did not speak to the detective again until the preliminary hearing. Ms. Searcy denied having said that it all happened so fast that she could not make an identification. She asserted that she had told the officer she did not want to make an identification at the time and would do it later; Ms. Searcy testified that she felt her identification, even if correct, could be called into question because she was on heavy medication. Ms. Searcy testified that she believed that she gave the officer a physical description of the shooter but told him that she "would not know who the person was, a name for him to find. He said the other victim at the hospital had given him the name and that is how he had come up with the line-up." Ms. Searcy testified that at first she could not see the gunfire, and more than one person could have been shooting initially. She testified that the person running was average height, with dark skin and shoulder-length braids or dreads and that she did not see him holding a weapon. She testified that all the shots sounded as though they were coming from one gun.

Kevin Crotts, an officer with the Metropolitan Nashville Police Department, testified that, upon his arrival in response to a shots fired call, no crime scene had yet been located. Officer Crotts collected statements and was called away to assist with an accident on the interstate. On his return, a crime scene had been located, and he recovered three shell casings close to where Ms. Searcy testified the shooting occurred. On cross-examination, Officer Crotts clarified that at first, a crime scene couldn't be found because officers were looking in the wrong place. He testified that it was not uncommon for police to receive a report of shots fired at the housing project where the shooting took place. He agreed that if a shooting took place overnight, there would be casings from the shooting.

Detective Mark Anderson, who was assigned to the gang unit with the Nashville police department, testified that he helped arrest the defendant at the defendant's girlfriend's house. Detective Anderson searched the house after the defendant's arrest and found $1,800 in cash in a dresser drawer and a loaded 9mm handgun underneath the bottom dresser drawer. The defendant's girlfriend claimed the items did not belong to her. Detective Anderson submitted the weapon, projectiles, and magazine for fingerprinting and to the ballistic database, and he testified that a match was made from the database to a shooting. On cross-examination, Detective Anderson testified that the magazine was fairly full, if not completely to capacity, and that a 9mm gun would generally hold ten or twelve rounds. He testified that he was not aware it was possible to get fingerprints from cash and he had not submitted the cash for fingerprint testing or any of the items to test for DNA. He testified

he did not request fingerprinting on the dresser where the cash and gun were found. The defendant was arrested several days after the shooting, and Detective Anderson had no knowledge regarding whether other persons had had access during that time to the residence where he was arrested. The defendant's girlfriend was in the presence of Detective Anderson and the United States Marshalls when she denied ownership of the money and weapon.

Isaac Martinez established that he delivered the weapon and bullets and the three cartridge casings to the Tennessee Bureau of Investigation for testing on October 21, 2009. Wayne Hughes testified that he test fired the gun twice on August 31, 2009, and that he put the casings and one bullet into a database. On cross-examination, Mr. Hughes testified that he did not wear gloves when he tested weapons and that the lab would get the weapon to fingerprint it before he fired it.

The State presented the expert testimony of Dr. Mickey Ott, a trauma surgeon at Vanderbilt University Medical Center. Dr. Ott testified that he treated Anthony Fizer, who had ballistics injuries to his buttocks, thigh, scrotum, and elbow. He also reviewed Ms. Searcy's medical records and testified that she was shot in the lower right arm, fracturing the bone, and that she had orthopedic surgery to fix the fracture.

The third victim, Ms. Dykes, testified that she was a public defender and that Ms. Searcy was working as her intern on August 17, 2009. Ms. Dykes' testimony regarding hearing the shots and deciding to run to the car was consistent with that of Ms. Searcy. As Ms. Searcy and Ms. Dykes ran towards the car, Ms. Dykes saw a muzzle flash. Ms. Dykes saw a man run from between two buildings, across the grass, into the middle of the street, and down the street toward Ms. Dykes. Another man followed. Ms. Dykes could not tell if the man being chased had been shot. Ms. Dykes testified that she and Ms. Searcy reached the car at about the same time and crouched down behind the back of the car. At some point as the women ran to the car, the man being chased passed them. They were crouched behind the car as the man shooting ran past them. They were "so close to him that had he chosen to shoot at us he could have hardly missed." Ms. Searcy told Ms. Dykes that she had been shot while they were crouched behind the car. Then they climbed in the passenger side of the car and drove away. Ms. Dykes checked the rearview mirror before leaving and felt the shooter was far enough away that he would not be able to hit them with a handgun. Ms. Dykes called 911 and arranged to meet an ambulance to take Ms. Searcy to the hospital. Ms. Dykes was asked if she got a good look at either man and answered, "Not a bit." During the incident, Ms. Dykes was afraid that she would be shot and killed.

The State then introduced evidence to connect the weapon found in the dresser with the casings recovered from the scene. A forensic technician with the Tennessee Bureau of Investigation testified that she received the three shell casings and the firearm and bullets on

October 21, 2009. Alex Brodhag, a firearms examiner with the Tennessee Bureau of Investigation and an expert witness for the State, testified that he had examined the three cartridge cases and the firearm with the bullets. Mr. Brodhag determined that the three cases had been fired from the 9mm weapon, which had a magazine that holds 10 cartridges. On cross-examination, Mr. Brodhag testified that he did not receive any bullets which had been fired and as a result did not match any bullets to the gun. He also confirmed that he could not determine if the cases had been moved from their original location or how long they had been on the ground. He testified that the Tennessee Bureau of Investigation had the capacity to test for fingerprints and DNA and that such testing would only be conducted when requested by the police.

Anthony Fizer testified that he had been shot on August 17, 2009, in his leg, arm, and testicle. He testified that after he was shot, he went to his sister's home at the housing project and then to Vanderbilt University Hospital. Mr. Fizer refused to answer further questions and was sentenced to jail time for contempt of court.

The State's final witness was Detective Andrew Injaychock of the Metropolitan Nashville Police Department. Detective Injaychock testified that he responded to the shooting by finding the location where the ambulance had picked up Ms. Searcy and examining the bullet holes in Ms. Dykes' vehicle. Detective Injaychock then testified that he developed the defendant as a suspect. When asked the basis of that, Detective Injaychock referred to an interview with Mr. Fizer; however, the court sustained the defendant's objection to Detective Injaychock's testimony regarding what was said. Detective Injaychock further testified that after "the first interview where the name was developed," he used information given by Mr. Fizer to locate a crime scene. He testified that Mr. Fizer was found at an apartment very near where the casings were found on the ground. Detective Injaychock testified that he put together a photographic line-up which was presented to Mr. Fizer. The defendant objected to testimony regarding whether Mr. Fizer was able to make an identification, but the court overruled the objection, and Detective Injaychock testified that Mr. Fizer identified the defendant from the array.[2] Detective Injaychock then interviewed Ms. Searcy and Ms. Dykes and signed an arrest warrant for the defendant.

Detective Injaychock testified that when the defendant was taken into custody, a weapon which matched the shell casings at the scene was recovered. The weapon was not tested for fingerprints. Detective Injaychock conducted an interview with the defendant during which the defendant stated that Mr. Fizer (who was apparently also known as

_____

[2]This issue was also discussed by the parties prior to Mr. Fizer's refusal to testify, and the defendant noted his objection to Detective Injaychock testifying to "anything [Mr. Fizer] said to him" if Mr. Fizer refused to testify.

"ManMan") had been with some men who had recently robbed the defendant. When Detective Injaychock referred to the cash recovered at the time of the defendant's arrest as $8,000, the defendant corrected him, saying it was $1,900. Detective Injaychock testified that he had two street names to help him identify the defendant, "Yellow Boy" and "Twan." The defendant had "Yellow Boy" tattooed on his arms. The police also received information that the defendant might be at the Jo Johnson housing development, and the defendant had "Jo Johnson" tattooed on his shoulder. When asked about the nickname "Twan," the defendant stated that his relatives had used that name when he was younger. The State then sought to introduce the photographic array, and the defendant objected. The trial court sustained the objection. The State then introduced an audio recording of the interview with the defendant. Detective Injaychock testified that no guns were found when Mr. Fizer was located as a victim. He testified that he did not test the weapon found with the defendant for DNA because he did not believe much DNA would be recovered.

In the interview with Detective Injaychock, the defendant asserted he had been with his girlfriend, whose last name he did not know, at the time the crime was committed. When asked about his relationship with Mr. Fizer, the defendant claimed that Mr. Fizer was present when the defendant had been robbed of $500 a few days before the shooting. He denied ownership of the gun found when he was arrested. During the interview, Detective Injaychock told the defendant repeatedly that "ManMan" had picked him out of a photographic line-up. He also told the defendant that Mr. Fizer had told the police that he was shot by "Yellow Boy," who lived at Jo Johnson. Detective Injaychock told the defendant that a second suspect was being developed and that the suspect would implicate "Yellow Boy." The defendant responded that he was no longer called Yellow Boy or Twan. Detective Injaychock told the defendant that Mr. Fizer had told the police the defendant's address and that he had told police the defendant "hangs out" at Jo Johnson. Detective Injaychock told the defendant that the witnesses from the public defender's office were "definitely going to show up for court." The defendant stated that they had not seen him shooting, and Detective Injaychock responded, "But Man-man did." He then referred to the gun and to some "dope" recovered from the apartment at which the defendant was arrested, and he told the defendant that there were other witnesses to the shooting and that "the old intimidating witnesses stuff doesn't fly anymore" because witnesses could get moved out of the housing project and into a house. He stated that police were in possession of the defendant's text messages. The defendant then denied that there was $8,000 at the apartment and stated it was $1,900.

On cross-examination, Detective Injaychock testified that he was not aware that the gun had been tested for fingerprints by Detective Anderson of the gang unit. Detective Injaychock identified a report from the Nashville police indicating that no prints were found on the weapon, and he confirmed that the defendant was not arrested at his home. He stated

that he had not been successful in the past in finding DNA on weapons. He acknowledged that he made statements in the interview that were not true, including that the police had text messages from the defendant. Detective Injaychock testified that he was aware of another man who had the nickname "Yellow Boy." He acknowledged that Mr. Fizer originally denied knowing who shot him. He acknowledged that Mr. Fizer may have been on pain medication at the time of the identification but stated he was coherent. He stated the second suspect was never found, although witnesses at the scene testified there was a second man. Detective Injaychock testified that Ms. Dykes could not make an identification. He further testified that Ms. Searcy also could not make an identification and that she provided no physical description of the shooter. He confirmed that witnesses testified that there were at least fifteen shots fired and stated that he would not dispute that the weapon held ten rounds and nine were still in the magazine on the day it was recovered. On redirect, he testified that Jo Johnson was not far by car from the location of the shooting.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, the defendant maintains that the evidence was insufficient to support the verdicts, essentially because he claims the issue of identity was never proven beyond a reasonable doubt. In support of his argument, the defendant points to the testimony that Ms. Searcy was unable to make an identification at the time of the crime, and he claims that nothing connected him to the gun found at his girlfriend's house. He argues that any testimony regarding Mr. Fizer's identification should not have been admitted.

A conviction must be set aside when the evidence is insufficient to support the finding of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). An appellate court reviewing the sufficiency of the evidence does not ask itself whether it believes guilt was established beyond a reasonable doubt, but instead evaluates whether any rational trier of fact could have concluded that the elements of the crime were proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). The appellate court may not reweigh or reevaluate the evidence or substitute its inferences from the circumstantial evidence for those drawn by the trier of fact. *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004). The State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978) *superseded in part by statute on other grounds as stated in State v. Blanton*, 926 S.W.2d 953, 958 (Tenn. Crim. App. 1996). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Once

the defendant has been convicted, the presumption of innocence is lost and replaced by a presumption of guilt, and the defendant bears the burden of showing that the evidence is insufficient to support the verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). In weighing the sufficiency of the evidence, direct and circumstantial evidence are treated the same. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011); *see Reid*, 91 S.W.3d at 277.

The defendant does not argue that there was insufficient proof of the statutory elements of attempted second degree murder or aggravated assault; instead, he challenges the evidence supporting the identity of the shooter. The evidence at trial included Ms. Searcy's eyewitness identification of the defendant as the shooter. Furthermore, although Detective Injaychock testified that Ms. Searcy was not able to make an identification at the time she was shot, Ms. Searcy denied being unable to make an identification at the time and offered testimony explaining her reluctance to identify the defendant from the photographic array. In addition to this direct evidence, the State presented circumstantial evidence tending to connect the defendant with the crime. At the house where the defendant was arrested, the police located the weapon which had fired the cartridges discovered near the crime scene. The weapon was in the same dresser as approximately $1,900 in cash, which the defendant did not deny was his; the defendant was able to correct police regarding the amount of this cash. The person who lived at that address denied ownership of the gun and the money. Identity is a question of fact which the jury must determine. *State v. Vaughn*, 29 S.W.3d 33, 40 (Tenn. Crim. App. 1998). The defendant took the opportunity to call Ms. Searcy's identification into question and argued that there was no fingerprint or DNA evidence to connect the defendant to the gun. Nevertheless, the jury could have inferred from the circumstances that the defendant had access to the dresser where the gun was found and that the gun used in the shooting belonged to him.

Taken in the light most favorable to the prosecution, the evidence at trial was such that a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. This is true even when we omit the evidence from Mr. Fizer tending to connect the defendant to the crime. Accordingly, this issue is without merit.

### B. Confrontation Clause Violation

The defendant asserts that the testimony regarding Mr. Fizer's identification of him was admitted in violation of the rule in *Crawford v. Washington*, 541 U.S. 36 (2004). The Sixth Amendment to the United States Constitution mandates that a criminal defendant be afforded the opportunity "to be confronted with the witnesses against him." *Crawford* clarified that under the Confrontation Clause, testimonial statements can only be admitted where the declarant is unavailable and where the defendant has had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 68. Testimonial evidence includes, at a

minimum, police interrogations. *Id.* The declarant in this case was unavailable because he "persist[ed] in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so." Tenn. R. Evid. 804(a)(2).

The State concedes that the statement was testimonial, that Mr. Fizer was unavailable, that there was no opportunity for cross-examination, and that the identification was therefore admitted in error. The State, however, claims this error was harmless. A violation of the mandates of *Crawford* is a non-structural constitutional error. *State v. Gomez*, 163 S.W.3d 632, 648 (Tenn. 2005) *overruled on other grounds by State v. Gomez*, 239 S.W.3d 733 (Tenn. 2007). A non-structural constitutional error must be reversed unless the State can demonstrate that the error was harmless beyond a reasonable doubt. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008). "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence." *State v. Parker*, 350 S.W.3d 883, 902 (Tenn. 2011) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1021-22 (1988)).

In *Parker*, testimony regarding the victim's description of the attacker and her statement that a hat belonged to him was improperly admitted along with properly admitted evidence that the defendant's DNA was on a hat in the victim's bedroom; that the defendant had been taken to the victim's residence by a friend; that the victim had stated the attacker was someone her son knew and that her son knew the defendant; and that her attacker had tried to rape her and had put her to the ground. *Id.* at 902-03. The Tennessee Supreme Court concluded that admitting testimony regarding statements made by the unavailable victim was harmless because "[h]ad the jury heard only [the properly admitted] proof, …we are convinced beyond a reasonable doubt that it would have convicted Defendant as it did." *Id.* at 903. Likewise, in *State v. Gomez*, the Tennessee Supreme Court found a violation of the defendant's right to confrontation to be harmless beyond a reasonable doubt. *Gomez*, 163 S.W.3d at 648. In *Gomez*, an accomplice's statements regarding a conspiracy to commit robbery were admitted in violation of the right to confrontation. The Court concluded that the error was harmless because an eyewitness identified the defendant; fingerprint evidence linked the defendant to ammunition found in a hotel room; the defendant's girlfriend testified regarding his participation in the crime; the statement did not identify the defendant; and the trial court gave instructions limiting its use to establishing a conspiracy. *Id.*

Looking at the "remaining evidence" of the defendant's convictions, *Parker*, 350 S.W.3d at 902, we conclude that the error was harmless beyond a reasonable doubt. Even without Mr. Fizer's identification of the defendant, the State was able to present an eyewitness who testified that the defendant was the man who shot her. Furthermore, the

weapon which matched cartridge cases recovered from the scene was found hidden at the house where the defendant was arrested. The weapon was located in the same dresser as money which the defendant did not deny was his and regarding the amount of which the defendant demonstrated knowledge. While the evidence here is not as overwhelming as in *Parker* and *Gomez*, we nevertheless conclude that the error was harmless.

### C. Sentencing Errors

In his final assignment of error, the defendant contends that the trial court erred by considering misdemeanor convictions to enhance his sentence or alternatively considering felony convictions both to establish range and to enhance the sentence. He further objects to the trial court's determination that he was a professional criminal in support of its imposition of consecutive sentences.

A defendant may appeal from the length, range, manner of service or imposition of consecutive sentences. T.C.A. § 40-35-401(a) (2010). Tennessee Code Annotated section 40-35-210(c) mandates that the trial court impose a sentence within the appropriate range and states that "the court shall consider, but is not bound by, the … advisory sentencing guidelines," which include adjusting the range according to the presence or absence of enhancing and mitigating factors. T.C.A. § 40-35-210(c), (c)(2). Previously, appellate courts reviewed the length of a sentence de novo upon the record with a presumption of correctness. However, in *State v. Bise*, the Tennessee Supreme Court concluded that the 2005 amendments to the Sentencing Act abrogated the de novo standard of review. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). Accordingly, we now review a trial court's decision regarding the length of a sentence for an abuse of discretion, granting a presumption of reasonableness to within-range decisions that reflect a proper application of the purposes and principles of the Sentencing Act. *Id.* In fact, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed" from the Sentencing Act. *Id.* at 706. It is no longer true that an appellate court makes a presumption of correctness which fails when the trial court applies inappropriate enhancement or mitigating factors. *Id.* A sentence within the appropriate range will be upheld so long as "there are other reasons consistent with the purposes and principles of sentencing." *Id.*

The trial court's order reflects that the parties agreed that the defendant was a Range II, multiple offender; the defendant's sentence fell within that range. *See* T.C.A. §§ 40-35-106, -112. The trial court found four enhancement factors. The court determined that the defendant had a previous history of criminal behavior in addition to the prior offenses necessary to establish the range. The defendant had five prior felony convictions, only two of which were necessary to establish the range; in addition, the trial court found that the

defendant had twenty-two misdemeanor violations. The trial court also found that the defendant had a previous history of unwillingness to comply with release into the community, in that he had not complied with his prior probation. The trial court applied the use of a firearm as an enhancement factor for the two attempted second degree murder convictions. Finally, the trial court found that the defendant committed the offenses while on release into the community. The trial court found no mitigating factors.

The trial court sentenced the defendant within the appropriate range and did not "wholly depart[]" from the Sentencing Act or the purposes and principles of sentencing. *Bise*, 380 S.W.3d at 706. Furthermore, while the defendant objects to the enhancement of his sentence based on his prior record, misdemeanors may be used to enhance a sentence, and the defendant cites no contrary authority. *State v. Ramsey*, 903 S.W.2d 709, 714 (Tenn. Crim. App. 1995); *see also State v. Avery*, No. M2008-01809-CCA-R3-CD, 2009 WL 4724430, at *15 (Tenn. Crim. App. Dec. 10, 2009). The defendant had three felony convictions above those necessary to establish the range, and the trial court found other enhancement factors applied. We conclude the trial court did not abuse its discretion with regard to the length of the defendant's sentences.

The trial court also ordered the sentences to be served consecutively. Under Tennessee Code Annotated section 40-35-115, a trial court may impose consecutive sentences if it finds it finds by a preponderance of the evidence that:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . [or]
>
> (6) The defendant is sentenced for an offense committed while on probation.

T.C.A. § 40-35-115(b). Consecutive sentences must also comport with the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2) & (4). *Bise* did not address whether the abuse of discretion standard of review is to be applied to a court's decision to impose consecutive sentences. However, prior to *Bise*, this Court has

written that the imposition of consecutive sentences, absent statutorily mandated consecutive sentences, "is a matter addressed to the sound discretion of the trial court." *State v. Hayes*, 337 S.W.3d 235, 266 (Tenn. Crim. App. 2010). The burden of showing error is on the appealing party. T.C.A. § 40-35-401, Sentencing Comm'n cmt.

In imposing consecutive sentences, the trial court found three statutory factors: that the defendant was a professional criminal who had devoted his life to criminal acts as a major source of his livelihood; that the defendant's record of criminal activity was extensive; and that the offense was committed while the defendant was on probation. The defendant excepts to the trial court's determination that he was a professional criminal. The trial court based this determination on the defendant's drug-related convictions, on his representation that he had never been employed, and on his own statement that he quit high school and began selling drugs to make money. The State also introduced testimony at trial that the large sum of money recovered from the dresser was in denominations commonly used in the drug trade. The record supports the trial court's finding regarding the defendant's status as a professional criminal. Moreover, the trial court's other findings are sufficient to support the sentence imposed. A single factor will support consecutive sentencing. *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995); T.C.A. § 40-35-115. For instance, an extensive criminal history alone justifies the imposition of consecutive sentences. *State v. Adams*, 973 S.W.2d 224, 231 (Tenn. Crim. App. 1997). The defendant had five prior felony and twenty-two prior misdemeanor convictions. We conclude that the trial court did not abuse its discretion in imposing consecutive sentences.

## CONCLUSION

We conclude that the evidence was sufficient to support the defendant's convictions, that the violation of the defendant's right to confront witnesses against him was harmless, and that the court did not err in sentencing the defendant. Accordingly, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE